Gary WILLIAMS, et al.

v.

Martin P. WASSERMAN, et al.

Civil No. CCB–94–880.

United States District Court,
D. Maryland.

July 31, 1996.

Steven Ney, Andrew Penn, Maryland Disability Law Center, Largo, MD, for Plaintiffs.

Timothy J. Paulus, Maureen Dove, Victoria Pepper, Kathleen Morse, Assistant Attorneys General, Baltimore, MD, for Defendants.

## MEMORANDUM

BLAKE, District Judge.

Now pending is the defendants' motion for summary judgment in this case. Oral argument was heard July 19, 1996. For the reasons discussed at the hearing and briefly set forth below, the motion will be denied.

The named and representative plaintiffs in this case are or have been residents of State institutions. Nine are described as "traumatically brain injured" ("TBI"); three are described as "non-retarded but developmentally disabled" ("NRDD"). They bring claims under the Due Process Clause of the United States Constitution, pursuant to 42 U.S.C. § 1983, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Essentially, their claims are premised on the alleged failure of the state to implement the recommendations of treating professionals and/or the parties' experts to provide community-based rather than institutional care.

### I.

▮ Regarding the substantive due process claims, the parties are in agreement that the controlling standard is set by *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), in which the Supreme Court addressed the rights of a mentally retarded individual involuntarily confined to a state institution. Under *Youngberg,* the plaintiffs in this case possess substantive liberty interests that require the State to provide adequately safe conditions, reasonable freedom from bodily restraint, and "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319, 102 S.Ct. at 2460; *see also Clark v. Cohen,* 794 F.2d 79, 87 (3d Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). A court determining whether a state has adequately protected those rights must inquire whether profes-

sional judgment has in fact been exercised; "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980), Seitz, C.J., concurring).

[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462. The Court also explained that the "professional" making decisions about long term treatment ordinarily should be someone with a degree in medicine or nursing, or with other appropriate training, rather than a prison administrator. *Id.* at n. 30.

The State makes several arguments in support of its motion for summary judgment on the constitutional claims. All would require this court to ignore the clear holdings of the Fourth Circuit in *Thomas S. v. Flaherty,* 902 F.2d 250 (4th Cir.) (*"Thomas S. IV "*), *cert. denied,* 498 U.S. 951 (1990), and *Thomas S. v. Morrow,* 781 F.2d 367 (4th Cir.) (*"Thomas S. II "*), *cert. denied,* 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673, *cert. denied,* 479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 161 (1986), as well as Supreme Court precedent.

▮ First, relying on *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the state contends that the plaintiffs' constitutional rights are protected only while they are institutionalized; once any of the plaintiffs are discharged, whether to the street or to a state-selected community placement paid for with state funds, the state is no longer under any judicially-enforceable obligation to those plaintiffs regardless of the constitutional adequacy of their treatment up to the day before discharge. *DeShaney,* however, is distinguishable, because it dealt with a state's obligations toward a child who had not been taken into state custody. The Fourth Circuit

acknowledged and rejected the state's attempt to rely on *DeShaney* in *Thomas S. IV,* 902 F.2d at 254–55, explaining

> We believe that the state's duty to render the kind of treatment prescribed by *Youngberg* is not discharged by simply releasing a class member from the institution where he or she had been hospitalized. Otherwise the state could unilaterally avoid the obligations imposed by *Youngberg* and *Thomas II* and defeat the claims of class members by terminating their institutional care while the case was pending.

The Fourth Circuit explained that the proper object of the district court's order granting relief to the *Thomas S.* class was "twofold: to ameliorate the lingering effects, if any, of improper treatment; and to remedy inappropriate community placements, if any, ... that were not anticipated by professionals in the institutions." *Id.* at 254; *see also Thomas S. v. Flaherty,* 699 F.Supp. 1178 (W.D.N.C.1988) ("*Thomas S. III*"), *aff'd,* 902 F.2d 250 (4th Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990). That is the type of relief sought by the *Williams* plaintiffs. Accordingly, this court's jurisdiction over the plaintiffs' claims cannot be terminated simply by operation of their release from the various institutions in which they are or have been housed during the pendency of this lawsuit.

▪ Second, as to all the plaintiffs, the state contends that because its litigation experts have opined that the treatment provided met professional standards, this must be taken as conclusive proof that professional judgment was in fact exercised, and the defendants are therefore entitled to summary judgment. This argument also must be rejected. While decisions of treating professionals are presumptively valid under *Youngberg,* no such deference is owed to the state's litigation experts evaluating the plaintiffs' treatment after the fact.[1] The opinions of the defense experts, like the opinions of the plaintiffs' experts, are relevant to determining whether the defendants' decisions regarding the plaintiffs' care represented a substantial departure from professional judgment. *See Youngberg,* 457 U.S. at 323 n. 31, 102 S.Ct. at 2462 n. 31. The defense experts' opinions are not, however, conclusive on the issue of professional judgment. The *Williams* plaintiffs have shown numerous instances where it appears that the state's treating professionals made recommendations for community-based care that were not carried out. Evaluating the context of those recommendations, and the reasons they may not have been implemented,[2] will require individual fact-based determinations not amenable to summary judgment. *See Thomas S. III,* 699 F.Supp. at 1196–97, 1201–02. The evidence from the plaintiffs' medical records, supported by the opinions of plaintiffs' experts, is enough to raise genuine issues of material fact about whether the plaintiffs received care constitutionally adequate to satisfy their protected interests in safety, freedom from restraint, and training.

▪ Third, the defendants raise the general issue of the limits that must be placed on a federal court's power to interfere with the state's freedom to allocate its limited resources. Certainly this is a legitimate and important consideration, but not one that can be used to deny all possibility of judicial relief. I do not suggest, and I do not understand the plaintiffs to argue, that there is a constitutional right to community-based treatment generally, *see, Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1249 (2d Cir.1984); *Phillips v. Thompson,* 715 F.2d 365, 367–68 (7th Cir. 1983); *Thomas S. II,* 781 F.2d at 375–76 (distinguishing *Phillips,* 715 F.2d 365). Nor is there a constitutional right to have every recommendation of a treating professional implemented regardless of cost or availability of resources. *See Jackson v. Fort Stanton Hosp. & Training Sch.,* 964 F.2d 980, 992 (10th Cir.1992) (citing *Thomas S. II,* 781

---

1. By emphasizing that they are "litigation experts," I in no way deprecate the professional qualifications or experience of the state's experts, whose opinions will be considered carefully at the trial of this case.

2. For example, there is a distinction between a treating professional's initial or temporary goal and that individual's final considered judgment about the treatment medically necessary to ensure minimally adequate care for a particular patient.

F.2d at 375). The plaintiffs' rights under *Youngberg* and *Thomas S. IV*, however, are entitled to protection. Appropriate respect for the principles of federalism does not require absolving state officials of their responsibilities under the federal constitution.

Accordingly, the defendants' motion for summary judgment as to the plaintiffs' constitutional claims must be denied.

## II.

■ The plaintiffs also bring claims under the ADA and its implementing regulations. The ADA incorporates the non-discrimination principles of § 504 of the Rehabilitation Act and extends them to state and local governments. *Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir.) (citing *Easley v. Snider*, 36 F.3d 297, 300 (3d Cir.1994)), *cert. denied* — U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). The Act provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. "Public entity" includes any state or local government. 42 U.S.C. § 12131(1). Accordingly, the elements of a cause of action under Title II of the ADA or § 504 of the Rehabilitation Act are:

1. the plaintiff has a disability;
2. the plaintiff is otherwise qualified for the employment or benefit in question; and
3. the plaintiff was excluded from the employment or benefit because of dis-

crimination based solely on her disability.

*Doe v. University of Md. Medical Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir.1995); *see People First of Tennessee v. Arlington Developmental Ctr.*, 878 F.Supp. 97, 100 (W.D.Tenn.1992).

■ The defendants seek summary judgment on several grounds. First, they argue that the relief plaintiffs seek is not a "reasonable accommodation" but rather a redesign of the state's mental health care delivery system requiring a "precipitous" transfer of funds to create "hundreds" of community treatment slots. (Defs.' Mem. at 63.) The plaintiffs rebut this argument, however, by pointing out that the state recently has approved community treatment slots for several of the plaintiffs. These placements indicate that what the plaintiffs seek is not a "fundamental alteration" in programs already offered by the state;[3] rather, they seek admission to an existing program of treatment on behalf of plaintiffs for whom such treatment is recommended. Similarly, while undue financial burden must be considered in analyzing the reasonableness of a requested accommodation, *see Pottgen v. Missouri State High School Activities Ass'n*, 40 F.3d 926, 929 (8th Cir.1994); *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987), genuine disputes of material fact remain between the parties concerning the relative cost of institutionalization as compared to community-based treatment. The defendants are not entitled to summary judgment on the issue of reasonable accommodation.[4]

---

3. The regulations promulgated under the ADA require that:

   A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity.
   28 C.F.R. § 35.130(b)(7).

4. The state also relies on the proposition that the ADA does not require "affirmative action" on the defendant's part to provide services, citing *Southeastern Community College v. Davis*, 442

U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). This is essentially a variation on the reasonable accommodation argument, however, as noted by the Supreme Court in *Alexander v. Choate*, 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 720 n. 20, 83 L.Ed.2d 661 (1985) ("In Davis, we stated that § 504 does not impose an 'affirmative-action obligation on all recipients of federal funds.' ... [I]t is clear from the context of *Davis* that the term 'affirmative action' referred to those 'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial,' or that would constitute 'fundamental alteration[s] in the nature of a program,' rather than to those changes that would be reasonable accommodations.") (ci-

Second, the defendants argue that the ADA does not preclude the state from offering benefits to one group of disabled persons without offering the same benefits to another group of disabled persons. *See, e.g., Traynor v. Turnage,* 485 U.S. 535, 548, 108 S.Ct. 1372, 1381–82, 99 L.Ed.2d 618 (1988) ("There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons.").[5] From that premise they contend that the ADA protects persons with disabilities from discrimination only in relation to non-disabled persons, and therefore denying community-based treatment to certain individuals based on the severity of their disabilities does not constitute actionable discrimination. The cases they cite, however, for the most part are distinguishable on their facts. Both *Johnson v. Thompson,* 971 F.2d 1487 (10th Cir.1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) and *United States v. University Hosp.,* 729 F.2d 144 (2d Cir.1984), deal with the application of § 504 to individual treatment decisions involving babies born with birth defects, a difficult issue expressly left open by the Supreme Court in *Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 624, 106 S.Ct. 2101, 2110, 90 L.Ed.2d 584 (1986) (plurality opinion). In *Johnson,* the allegation of discrimination based on degree of handicap was rejected because the infants were not "otherwise qualified" for the treatment they did not receive. 971 F.2d at 1493–94. In *P.C. v. McLaughlin,* 913 F.2d 1033 (2d Cir.1990), involving a mildly retarded man with assaultive behavior placed in a school for the severely retarded, the court found no violation of § 504, noting that § 504 "does not require all handicapped persons to be provided with identical benefits," 913 F.2d at 1041 (citing *Traynor,* 485 U.S. at 548–49, 108 S.Ct. at 1381–82). The court also noted, however,

that the plaintiff did not claim he was refused participation in any particular program, nor was there any proof that more suitable accommodations were available and not offered to him. *Id.* at 1041–42.

Opinions more directly relevant to the *Williams* case include *Martin,* 840 F.Supp. at 1191–92 (relevant inquiry is "whether the application [of] § 504 between persons with different or varying degrees of disability furthers the goal of eliminating disability-based discrimination"); *Conner v. Branstad,* 839 F.Supp. 1346, 1356–57 (S.D.Iowa 1993) (question of material fact whether plaintiffs were excluded from community based programs solely by reason of the severity of their handicaps, and whether defendants could have made reasonable accommodation for plaintiffs' handicaps); *Jackson v. Fort Stanton Hosp. & Training Sch.,* 757 F.Supp. 1243, 1299 (D.N.M.1990) ("Defendants' failure to accommodate the severely handicapped in existing community programs while serving less severely handicapped peers is unreasonable and discriminatory."), *rev'd on other grounds,* 964 F.2d 980 (10th Cir.1992); *Plummer v. Branstad,* 731 F.2d 574, 578 (8th Cir.1984) (assuming without deciding that the severity of the plaintiffs' handicaps is itself a handicap which under § 504 cannot be the sole reason for denying benefits).

The Third Circuit's analysis in *Easley* is instructive. That case involved the right of certain physically disabled persons who were not mentally alert to receive the benefits of a home care program designed by the state for physically disabled persons who were mentally alert. While concluding that a state may provide a benefit to certain classes of disabled persons and not others, without violating the ADA, the court first analyzed whether mental alertness was part of the essential nature of the home care program and wheth-

tations omitted). *See also Martin v. Voinovich,* 840 F.Supp. 1175, 1191 (S.D.Ohio 1993) (premature at motion to dismiss stage to assume that if court found § 504 violation it would order defendants to expand or create new programs; court might instead order defendants to provide community housing without regard to disability from date of judgment).

**5.** In *Traynor,* however, which approved the granting of benefits to one class of disabled veterans but not another (those with "primary alcoholism" not motivated by mental illness) the Court explained that: "Those veterans are not, in the words of § 504, denied benefits 'solely by reason of [their] handicap,' but because they engaged with some degree of wilfulness in the conduct that caused them to become disabled." 485 U.S. at 549–50, 108 S.Ct. at 1382–83.

er the use of surrogates as decision-makers for non-mentally alert persons would be a reasonable accommodation. If mental alertness had not been an essential part of the program, or if the plaintiffs in *Easley* could have participated in the home care program with a reasonable accommodation, then they would have been "otherwise qualified" individuals and refusal to provide them the benefits of the home care program would have been discriminatory. *See Easley,* 36 F.3d at 300–305. Finding that mental alertness was essential, and the use of surrogates was not a reasonable accommodation, the Third Circuit explained:

> This is not a case of State discrimination against a subgroup of the group of people who are physically disabled. On the contrary, this is a case where an additional handicap, a severe degree of mental disability, renders participation in the program ineffectual.

*Id.* at 306. Consequently, the court found that the State could exclude Easley from participation in the home care program without violating the ADA.

The Fourth Circuit's opinion in *Myers v. Hose,* 50 F.3d 278 (4th Cir.1995) is not to the contrary. Myers, a bus driver who could not safely perform his job because of his poor health, requested extended paid leave while he attempted to improve his condition. The Fourth Circuit found that unscheduled paid leave was not a reasonable accommodation. The Fourth Circuit's further explanation that the County was not required to offer this accommodation to Myers simply because it had been offered to other disabled employees, is not inconsistent with the plaintiffs' position in the present case. The Fourth Circuit emphasized that the employees who had been accommodated by the County differed from Myers in at least one "critical respect:" each was suited for certain accommodations not available to Myers because of his physical condition. *Id.* at 285. Thus, Myers' particular disability rendered reasonable accommodations available to the other disabled employees unavailable to him.

In short, while the ADA does not place an affirmative obligation on the state to create or fundamentally alter a program of community-based treatment options, the ADA does oblige the defendants to make those options available to otherwise qualified individuals without regard to the severity or particular classification (e.g, TBI, NRDD) of their disabilities.

The plaintiffs in *Williams* advance an additional theory in support of their ADA claim that does not require a showing of discrimination between different groups or subgroups of disabled individuals. Regulations promulgated under Title II of the ADA by the Department of Justice at the direction of Congress contain a category of "general prohibitions against discrimination," one of which states, in full:

> A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

28 C.F.R. § 35.130(d). The Third Circuit recently found that these regulations were entitled to "substantial deference," and that Congress in enacting the ADA demonstrated its approval of the § 504 coordination regulation on which 28 C.F.R. § 35.130(d) was based. Thus, the Third Circuit concluded that: "the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled." *Helen L.,* 46 F.3d at 333.[6] In *Helen L.,* the defendant argued that it could not make home care available to a disabled plaintiff who had been placed in a nursing home, because of the state's asserted inability to transfer the necessary funds from its nursing home program to its home care program within that fiscal year. The court rejected this justification, because the plaintiff's demand did not require a public entity to make "fundamental alterations" in its programs or assume an "undue burden" in order to comply with the integration regulation under the ADA. *Id.* at 336–38. Emphasizing that the program was already in existence and was

---

**6.** In *Helen L.* the court invited the Department of Justice to submit an amicus brief addressing the integration regulation. I appreciate the Department's willingness to provide an amicus brief in this case as well.

less expensive than the nursing home program, the court required the defendant to make attendant home care services under the existing home care program available to the plaintiff.

I find the Third Circuit's reasoning plausible and consistent with the purposes of the ADA.[7] The defendants' memorandum concedes that the analysis of *Helen L.* can stand "if community placement is a 'reasonable accommodation' on the part of defendants." (Defs.' Mem. at 67.) I agree. The holding in *Helen L.* is limited and does not endorse or require broad relief of the kind the defendants fear. *Helen L.* does not support the imposition of court-ordered relief that would require "transferring millions of dollars from institutions to the community" (*id.* at 73) or otherwise fundamentally altering the state's programs.

Accordingly, the defendants' motion for summary judgment on the ADA claims also will be denied.

The *Williams* plaintiffs filed a motion for summary judgment on behalf of four plaintiffs on the claim that the defendants discriminated against these plaintiffs under the ADA integration regulation. They rely in part on the fact that community-based treatment has now been approved for these plaintiffs. The fact that such placements now have been approved, however, does not eliminate all issues of material fact concerning the appropriateness of such care at earlier times in the patients' history, and whether such placement would have been a reasonable accommodation at that earlier time.

Because genuine disputes of fact remain as to the ADA claims, both parties' motions for summary judgment must be denied.

7. *See, e.g.,* the Congressional statement of findings that:

    (2) historically, society has tended to isolate and segregate individuals with disabilities ...

    (3) discrimination against individuals with disabilities persists in such critical areas as ... institutionalization ...

    (5) individuals with disabilities continually encounter various forms of discrimination, including ... segregation ... 42 U.S. § 12101(a).